3-19-0197 Consolidated with 3-19-0361 In re Marriage of May Yazeji and Rassam Asaq, Appellant. Okay. Are Council ready to proceed? Yes, Your Honor. Yes, Your Honor. Okay. Mr. DiDomenico, I believe you are splitting time. Is that correct? That's correct, Your Honor. We're splitting the time. I'm going to take 10 minutes and address the children's issues. Mr. Hammond will take the remaining 5 minutes and address the property dissipation and attorney's fees issues. Okay. Very good. Mr. DiDomenico, you may proceed. Justice Holtridge, and may it please the Court, again, Michael DiDomenico for Dr. Rassam Asaq, on the children's issues. The elephant in the room, of course, in any child custody appeal is the standard of review. We're on an abuse of discretion review for the allocation judgments. The predicate factual findings underlying the allocation judgment are reviewed under the manifest weight standard, which, as we know, requires me to demonstrate that the opposite conclusion is clearly apparent. Time is short. I want to focus on one particular finding that the Circuit Court made in the allocation judgment that we feel drives this entire case. And that is the Circuit Court's finding that parental alienation was not established here by a preponderance of the evidence. Let's start with what is parental alienation. Parental alienation describes the breakdown of the relationship between a child and one of the child's parents when there is no valid justification for that breakdown. It's when one parent engages in actions that cause the child or children to strongly ally with one parent and reject the other without legitimate justification. And we know that from the teaching experts in this case, Dr. Burnett, Dr. Evans, who testified effectively as teaching experts as to the science of parental alienation. I found particularly interesting Dr. Burnett testifying that this is a concept that goes back to Greek mythology. It's a factor that has been recognized in our custody statute for a long time. Factor 11, as it stands today, the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. As time has gone on, as the teaching experts explained, there's been a lot of science that has developed around this. There are now recognized symptoms of parental alienation that are found in alienated children. There are now alienating behaviors that are recognized that the alienating parent engages in. What we want to focus on here is what was the evidence on this issue? What was the evidence on the science? What was the evidence factually that make up the circuit court's determination that alienation wasn't afoot here in this family? We focus on this because we really believe that this issue informs the parental allocation calculus. Because if this is wrong, then we believe that reversal is required. What was the evidence on alienation? We start with Dr. Witherspoon, who was the court-appointed child custody evaluator. He was the only expert in the case who performed a full forensic analysis of this entire family of the children. In summary, his findings were that the appellee and his current mother appears to have directly reinforced the efforts of the children. May I interrupt you, counsel? There seems to be some background noise coming from somewhere. Is it in our court? Yeah, I think it's in the clerk's office. Will the clerk of the court please silence our court? Done. Hello? He did it. It's done. It stopped. I'm sorry about that, Mr. DiDomenico. You may proceed. We'll try to grant you a little leeway for the time we took from you. Thank you, Justice Holdredge. Dr. Witherspoon observed that the children were disrespectful and obnoxious with their mother and their father, and that they appear to have taken advantage of a power vacuum that the parents have pitted against each other. But that the mother has reinforced that these efforts, and these efforts of the two older children in particular, to go that the children have grown manipulative in the service of advocating for remaining in the primary care of their mother. And the finding from Dr. Witherspoon is that she supported that, is that she has reinforced those efforts on behalf of the children. And that is one of the hallmarks of… But didn't the trial court find that because Dr. Witherspoon didn't testify and the findings are old, that he didn't… Were they going to admit that report from Dr. Witherspoon? No. The report was pursuant to statute. It's a 604 report. Pursuant to statute, the report comes in as substantive evidence as a matter of law, subject only to cross-examination by presumably whatever side of the case doesn't like the findings. The other side, my opponent in this case, did not choose to call Dr. Witherspoon for purposes of cross-examination. So his report comes in as substantive evidence. It was not impeached in any way. In fact, it was sought to be barred at the beginning of this case, at the beginning of the trial by the other side. They claimed that it was… Effectively, that it was stale, but the judge denied that. Okay. So he didn't… He's… Okay. And Justice O'Brien, to your point, you know, we're… This is part and parcel of one of the reasons, you know, that we challenge this is against the manifest way to the evidence that, you know, Dr. Witherspoon was the court's own expert. Common law says that court's witnesses are presumed neutral. The statute requires the other, whoever doesn't like the findings, to come in and to bring him in for purpose of cross-examination. There was nothing in the record, from an evidentiary perspective, to be dismissive of Dr. Witherspoon's conclusions. In fact, the rest of the professional testimony that we'll talk about in a second fully supports it. And the fact that in this hundred-and-some-page written judgment that Judge Church wrote, that it was… That Dr. Witherspoon's report and conclusions were ignored entirely. Not a word was written. That is troublesome to us. We're not aware of any case where a 604B that was unrebutted was ignored in total. The next part of the evidence on parental alienation in this case… So, you're finding in some, to make it simple, that Dr. Witherspoon was… There's no evidence in the record that his perspective, so to speak, was considered at all? Or ignored? Or not referenced at all? Yes, it's not referenced in the judgment in any place. Every other non-party witness had space devoted to it in the written judgment, but not Dr. Witherspoon. And we were at a loss as to why that was. The other professionals that testified in this case that backed up the alienation finding was Mr. John Sample, who was appointed as a family therapist. Not in a diagnostic role, but he was appointed to do family therapy. And his findings were… His findings were objective and uncontestable in that the children had severe and unjustified rejection of my client to the extent of distorted thinking, which is one of the hallmarks of alienation that Dr. Burnett testified to as sort of a teaching expert in this case. Well, these are teaching experts, but what expert opinion did they give? Any? They couldn't. Neither teaching expert could give a valid medical opinion because neither teaching expert interviewed the children or the parties. Dr. Burnett, which was my side's teaching expert, stated as much. She says, I haven't evaluated the family. I can't opine specifically or render a diagnosis on these children or this family. But I can tell you, I can instruct the court, inform the court as to what parental alienation is and the characteristics of the alienating parent and the children. And then the way the case was tried, it was tried against the backdrop of that information that was put forth about what alienation is, what the factors are. And there's numerous examples of that. We take time in the brief to go through all of those different factors and show how the different acts of the children misbehaving, the false police reports, the unfounded DCFS findings, how all of those match up in one way or another with the different factors that should have established alienation. Mr. Sample also talked about how the appellee undermined and abused the therapeutic process. Due to her behaviors, he was compelled, Dr. Sample does, to write letters to counsel and ultimately voiced concern about the appellee's manipulation of the children. He stated she was trying to sabotage the family therapy and played dumb when confronted within the therapy sessions about her behaviors. These are the hallmarks of alienating behavior. Let me read you one other thing that Mr. Sample observed, and that's signs of intense emotional enmeshment between the older children and the mother, that their relationship was collaborative and that they wanted to take down my client, work together to destroy his relationship with the children. This was a collaborative effort by the appellee in conjunction with the children. Again, these are the hallmarks of alienation. The other big piece of evidence on the alienation front is Dr. Jackie Chang, who was appointed to test one of the younger children, John. She outright diagnosed John as having alienation syndrome, as having hallmark symptoms of parental alienation. And that's again detailed in our brief. I want to talk about briefly... Mr. DiDomenico, I've let you run over your time in fairness to the interruption that we had to incur. But now I believe co-counsel is going to address the court for the remainder of time. Yes, sir. Mr. Hammond will address the court on the property issues. Okay, very good. You'll have time in reply, both counsel. Okay. However you split up your reply. Counsel, you may proceed. Thank you, Justice Holdredge. May it please the court. Sean Hammond on behalf of the Appalachians. My colleague talked to you about some of the factual issues with respect to the children and some of the facts that were overlooked and otherwise ignored by the circuit court with respect to the allocation of parental rights and responsibilities. I'm here to talk to the justices today about the legal errors that the court made with respect to its refusal to consider the valid dissipation claim that was set forth before it, as well as its finding of a contribution of attorney's fees without making the requisite findings required by our Supreme Court reiterated throughout the case law. Justices, when we talk about the findings of dissipation, the circuit court itself acknowledged that it had an issue with one specific thing. It took issue with the date of the breakdown, the irretrievable breakdown of the marriage in this case. However, the analysis does not end there. It is not simply sufficient to say I disagree with your assertion of a breakdown date. Therefore, I'm not going to consider anything that happened thereafter. That is not something that has been found in any piece of jurisprudence in analyzing 503D, and it's something of the circuit court's own interpretation and imagination. Here, we are not talking about a harmless error. The circuit court found that the irretrievable breakdown date occurred between September and October of 2013. Subsequent to that breakdown date, according to Dr. Assaf's allegations and claim dissipation, no less than $654,000, more than the entire sum that Dr. Assaf was awarded in the property division, was considered and alleged to be dissipation. The circuit court found that he had made a valid notice, and by that valid notice, he shifted the burden to May to rebut the claim by clear and convincing evidence as set forth in the statute in 503D. May did nothing to do it. The judge did nothing to consider it. And sometimes when reviewing courts look at the underlying decision, they say, well, didn't the judge implicitly consider the factors? Isn't this something that is in the soup, so to speak? However, this is not a case where it is implicitly considered. It is explicitly excluded in the judge. The opinion says, I am not considering, and what the basis for not considering the dissipation claims that were after the breakdown date were is unknown. It's unknown why the court didn't follow through with its obligation to consider all relevant factors under Section 503D as the statute requires. The statute in no uncertain terms says that the court shall consider all relevant factors. Here, the court did not say it was not relevant. Here, there was not a finding that the claim had not been asserted. To the contrary, the court said a valid notice of dissipation claim had been asserted, and in fact, went so far as to say there was not a dispute on that point. However, inexplicably, the court failed to consider a 503D factor. When you fail to follow the law, you naturally abuse your discretion on the overall conclusion. However, we submit that there is no deference afforded to the circuit court with respect to the application of the law. It is purely an issue to know about. And in that legal issue, the court committed a legal error by not following the black letter of the statute. And by not following the black letter of the statute, an equitable division was necessarily not made. You cannot say, well, I'm not going to consider some of the 503 factors, and I'm going to decide on the rest. When a relevant claim is set forth, the court is required to consider it, and that is what the Fifth District held in marriage of Brown, a case that we cite prominently in our opening brief, to which no response. In addition to failing to consider the hundreds and hundreds and hundreds of thousands of dollars of dissipation that were validly before the court, for no reason whatsoever in direct contravention of the statute, the circuit court went beyond that to then go on and award a contribution of attorney's fees pursuant to Section 503J. And although we submit that the court misapplied Section 503J, I would ask you justices to look to the guidance of our Supreme Court with what a contribution to attorney's fees requires. To tell your honors what you well know, attorney's fee statutes are an abrogation of the common law and strictly construed. It is not something that is saved by the general equitable nature of a chancery case, a dissolution case, or any other case. It is a strict construction statute. And in that strict construction statute, our Supreme Court has stated in no uncertain terms in Schneider that a party seeking contribution to their fees must demonstrate an inability to pay their own fees. Our Supreme Court reiterated that in 2017 in the case of Meredith Heroy, which looked in the context of a post-decree action. It is not sufficient to say, as the court did, that this was to more equitably equalize the estate. That is not the purpose for the construction of Section 503J. Your honors, I see that my time has expired. My thought. I appreciate it. Thank you. Thank you, counsel, both. You will have time in reply, however you decide to reply. Okay. Very good. May it please the court. My name is David Anditch. I represent the affilee, Dr. Maya Zaghi. Not surprisingly, your honors, we view the evidence very, very differently from what counsel just described. Specifically, before I get into my general presentation, I would like to say up front that Mr. DiDomenico is wrong in at least two respects. John Sample did not say that there was parental alienation present. He did not come to that conclusion in a final professional opinion. You have to read the testimony. You'll come to your own conclusions. The second point where Mr. DiDomenico was flat out wrong is Dr. Jang, Jackie Jang, also did not make a finding or come to a professional conclusion that parental alienation was present. Those are absolutely incorrect statements. They will be refuted when the court reads the testimony of those two witnesses. I just wanted to get that out right at the up front. Judge Church wasn't wishy-washy about his findings. There's a 110-page opinion or so. But I think your honors will find his language interesting. When he talks about parenting time, he says in the opinion he's convinced that it would be highly detrimental to the best interest of the children to allocate primary parenting time to respondent. He didn't just say that the best interest would be for parenting time to be in Dr. Yazagi. He says it would be highly detrimental. I think it's fascinating language. I think it is an expression of how strong Judge Church felt about this. The same is true when I get to the language he used in his finding on decision-making authority is quite bold. The evidence, there's an awful lot of evidence that parenting time should have been awarded to Dr. Yazagi. A good amount of it actually occurred before the 38-day trial started. By that time, by agreement of counsel, the evidentiary record for this trial included the prior case that came up to this appeal. That was the order of protection case against Dr. Assaf, where Judge McNeil found in the trial court and Judge Kathleen Message, of course, on an emergency order of protection request, both found that Dr. Assaf had abused Johnny in an event that happened in their house after they returned from the drugstore. I'm sure that Justice Holridge and Schmidt are familiar with the case I'm talking about because it was before this court. It was affirmed in a two-to-one decision. Justice Schmidt was a dissenting opinion on that, whether the child was abused by Dr. Assaf. This court found that he was. Judge Kathleen Message and Judge William McNeil found that he was abused. That stands as the holding and the record evidence that was introduced by agreement and stipulation of all counsel. That was before the trial started. One other event occurred in New York on a vacation that Dr. Assaf took the kids to New York City for a few days. And there was another upheaval that happened at night when Dr. Assaf accused Johnny of not brushing his teeth at sometime between 2 and 3 in the morning. It, again, got out of hand. And Johnny was, there was physical contact between Dr. Assaf and Johnny. And Johnny ends up with a bloody lip and goes in the bathroom and takes some photographs that were introduced and what his mouth looked like from what Judge, from what Dr. Assaf did to him in sitting on him and the contact that took place between them. Judge Church felt that a hearing had to occur to figure out whether Dr. Assaf had violated Dr., had violated, excuse me, Your Honors, William McNeil's holding on the order protection case included instructions to Dr. Assaf about how timeouts should proceed because they got so out of hand in this particular case. So that hearing transpires. The kids testify. Dr. Assaf testifies. And Judge Church then finds that he, again, violated the prescription, the rules from Judge McNeil on how timeouts were to proceed. Another example of physical abuse by Dr. Assaf. And those aren't the only two that occurred, Judge, Judge's, Justice, excuse me. The record is full in the testimony from the children, their interviews, they were complaining about the physical contact that occurred and that they observed with Dr. Assaf when they were at his house. And that was his idea of somehow taking care of the kids. And Dr. Usagi also testified at length about physical incidents that had occurred where Dr. Assaf had grabbed her arm, had done some physical incident and contact with her. And so the record, when you read it, Your Honors, you will see it is absolutely loaded with evidence of physical abuse and both against the children and against Dr. Usagi. And it is the opinion of the experts, of course, as I will get to soon, although I think Mr. DiDomenico probably disagrees, that physical abuse by one of the parents negates the entire issue. It nullifies a conclusion of parental alienation. Peter Church, Judge Church, had tons of evidence of physical abuse by Bassam Assaf against involving his kids and involving Dr. Usagi. And as a consequence, if you apply Dr. Burnett's testimony, the instructional testimony, or the testimony of Dr. Evans, they both said firmly. Mr. DiDomenico wants to get disagreement with me about what the quotation from his expert, Dr. Burnett, says. But to us, it clearly says that he too concludes, as a recognized expert, that physical contact by the parent absolutely nullifies the claim of parental alienation. That's our view. Judge Church absolutely accepted it as being correct principles of parental alienation. And as a consequence, rejected the conclusion that there had been parental alienation in this case. I want to talk for a minute about the totality of the expert's testimony also, Justices, if I may. There were a number of experts. Mr. DiDomenico is correct. Dr. Evans, the recognized experts, I guess, Dr. Evans and Dr. Burnett said that they had no opinion about whether there was parental alienation present. Because, in essence, they couldn't make it because they hadn't examined or met with any of the subjects of this family. You then get to John Sample, and contrary to what Mr. DiDomenico says, John Sample testifies that he never made a diagnosis under the DSM-5 of psychiatric conditions book. He says it's inconclusive whether any parental alienation is present. That's his bottom line position. And I just wanted to make sure that your honors look closely at these opinions. Jackie Jang was remarkably similar. She says in her testimony, as an expert witness, I haven't really seen all the kids and the mother and father and done an evaluation on them. So Jackie Jang says she can't make any definitive decision on parental alienation. And the only thing Dr. Jang can conclude is that this child, Johnny, is the only one she's involved in, that he has something called, psychiatrically, adjustment disorder. And she adds that she also found traces of parental alienation. When your honors read the record, you're going to see some fascinating testimony of the cross-examination of Jackie Jang by my colleague, Dan Churchill, in which she talks about what I would call the pressure being applied. John Sample was in constant contact with her. John Sample was in constant contact with the parental alienation attorney from up north, out of state, throughout this entire case. But what's important about what I'm saying right now is that Dr. Jang testifies that when she gave Sample a prescreening of her report, because I guess she felt she had to, because she was hired and brought into the case by Sample, there's an interchange where she says that Sample wanted her to add certain words to her report. And those words, as you'll see her testimony, are the fleeting reference, quote, traces of parental alienation. That's what they talked about. As she made a revision and submitted to all of us as her final report, she added the reference to traces of parental alienation. Judge Church, in contrast, found that adjustment disorder, her finding, had nothing to do, was not connected with parental alienation, and didn't emphasize that part of Jackie Jang's testimony. But he went on and he did value part of Jackie Jang's testimony when she testifies that there are four types of parents, authoritarian, authoritative, permissive, and non-involved. And Dr. Jang goes on in her testimony and says that for a child who is rebellious, I believe that was her word about John, somebody who's always got something to say about something to their parents, that the best type of parent for them was an authoritative parent. And then she goes on to conclude that, or the judge does in his opinion, that in applying her four types of parents in their relationship to a child like Johnny, that authoritative best described Dr. May. So I understand why they don't like Jackie Jang's testimony. I think it's a large plus and a large support for Judge Church's opinion and decision in this case. So I urge all you justices to read that. I also would ask you to read, in further support of Judge Church's parenting time and decision-making authority, read the guardian ad litem reports. There are two of them, one that was issued right before the trial. Derek Hanks was the guardian ad litem. He was one of the most, I think, open and honest persons to talk about the difficulty that these kids suffered with their dad in trying to get anything done that didn't involve some overreaction and really stressful situations for their kids. And he started fights about an inordinate amount of things, and things that would normally go, exchanges between a child and a son, because of Judge Assaf, the temperature and the volume of the dialogue really went up because of his parenting. And I think, in large part, he's very critical of Dr. Assaf and finds that's the problem with the case. He did not find parental alienation either. So really, the only person you have in this long case is Dr. Witherspoon. Dr. Witherspoon issues his order in his evaluation, I'm sorry, it's about 80 pages, in 2016. There was no doubt that we felt and others felt, Judge, just as I can't tell what color that light is. Mr. Anditch, you just turned red. If you'd like to finish your statement. Yes. Thank you, Justice Ullrich. Dr. Witherspoon, you were saying. Dr. Witherspoon should issue an updated report. We're trying this case in 2019 and going into 18, excuse me, in 18. And so his report borders on being three years late, past due, past the time. So that's when his custody evaluation was made. And it's sort of a compromise to all of us. Judge Schertz says, I'm going to enter an order. And I want Dr. Witherspoon, who is the court appointed expert, to update his earlier report by two and a half years. He responded, Dr. Witherspoon, on December 15, he notifies Judge Church, and I believe copies went to all of us, if I'm not mistaken, but either that or Judge Church gave it. And he said, as a court appointed expert, he would not update the custody evaluation, even though he was not discharged, he refused to do what Judge Church ordered him to do. The question of how much weight to give to that expert, I've never seen that in 43 years of practicing law, a court appointed expert refusing a judge's order that was very necessary for this custody trial. He offered no explanation whatsoever. He was not discharged, and he still did nothing. Judge Church had every reason. Okay, we got the point. You're done. Thank you, Justice Schmidt. Geez. Okay, sorry about that, Mr. Anditch. That's not the sentiment of the entire court. Okay, Mr. Mr. Hammond. You may reply and I will enlarge your reply to establish some equity. Okay. I appreciate that. Thank you, Justices. I want to pick up where Mr. Anditch left off when he paraphrased what Dr. Jang found. Mr. Anditch left off by saying that Dr. Jang included adjustment disorder. That is the first word in the sentence. However, the entire sentence reads adjustment disorder with mixed disturbance of emotions and conduct behavioral and emotional traits of parental alienation. It is the remainder of that sentence that informs the first portion that has found the record at 57 10 through 57 12 and is cited on page 16 of our brief. Mr. And it's a suggestion that Dr. Jang did not make any conclusions regarding parental alienation simply leaves off the rest of her son. Now, turning to Mr. Sample and Mr. And it said that Mr. Sample did not include the parental alienation been present in this case. However, Mr. Sample stated, quote, that may suggestive negative influence on her children is parallel with the behaviors described in the literature as parental alienation syndrome. And that is found the record 54 51 through 54 52 cited on page 14 of the brief. Having clarified those misconceptions regarding what the experts found, it is clear that the experts uniformly found the traits and behaviors of parental alienation across this case. Although Judge Church did issue a lengthy opinion, the lengthy opinion does not mention the science or the evidence related to alienation. With respect to the other thing that Mr. And it's argued is listen to the children, listen to what they said. Children don't like him, so we've got a believer. And I would direct Mr. And it's to his own expert, Dr. Evans, who stated no uncertain circumstances. You can put a child on a lie detector test and they would pass it. Now that happens once their belief system has been altered by the alienating parent as found in the secured record at 1746 through 1747 cited on page 50 and 51 of our brief. All of these mistakes are the same mistakes that the circuit court fell into. You look at half of the evidence and you don't conclude the ultimate conclusion. Each one of these experts looked at the various facts, looked at the science, and that is something the circuit court did not do. And specifically did not look at the science. Nowhere in the 110 pages do you see anything regarding the science of parental alienation. However, the suggestion that any instance of abuse therefore negates alienation, the otherwise alienating effects of May in this case, which is something that May set forth in her brief, was that that was the primary focus of the dispute. And as Mr. Anders pointed out, Justices Holdridge and Justice Smith are very familiar with the allegation of abuse the first time around. Following that allegation of abuse, a number of facts came to light that your honors didn't have in making the ultimate two to one decision that the circuit court had not abused its discretion. The ultimate facts that came out subsequent to that hearing on the order of protection speak volumes about the quality of that alleged abuse and explain and inform this court why such a bright line standard would never make any practical sense. There is a varying degrees, just like in anything else, of things that can be characterized under the broad domestic violence act as quote unquote abuse. However, neither of the justices nor the third justice hearing the case were so concerned as to limit Bassam's parenting time. May was not so concerned as to seek to re-up the order of protection. She made no efforts to extend it, let it lapse, and we moved on. Bassam's parenting time was never supervised. There was never any indication that his parenting time was limited or that this alleged abuse was of such quality in nature that it negatively affected the children. However, May's emotional abuse and alienating the children has impacted them for the remainder of their years, and that is something that all of the scientists, doctors, and every testifying individual agree. The allegations of abuse, no matter how hard May tried, no matter how bombastic her allegations got, do not excuse her otherwise alienating behavior. Now, your honors, my last minute, I will turn to the remainder of the contribution argument that I did not finish in the first time around. And what I was going to say before my time ran out, your honors, is that in addition to failing to follow the mandates of the law, even if you could implicitly find what the circuit court did not, that the finding was made that May could not afford to pay her own attorney's fees or that it substantially undermined her financial ability, no reasonable human being could make that finding in conjunction with the remainder of the findings in this case. May is found to earn more than Bassan. May is found to have a client list from which she will derive future income to have a value of double Bassan's. May was awarded more property than Bassan. So if she has a higher earning capacity, she has more property, and in addition to that, that's not even considering the hundreds and hundreds of thousands of dollars of dissipation that were not claimed. If you include those into the estate, it's closer to an 80-20 division and not a 50-50 division. No such thing as equitably equalizing through attorneys. That is not how fee shifting provisions work. Fee shifting provisions in the United States are strictly construed because they are an abrogation of the American rule. No reasonable person could look at the facts of this case and determine that somebody who received more property, who earns more money, and is allocated every indicia of higher earning and financial stability has a less ability to pay her own fees simply because she charged more fees or was charged more fees. While her fees may have been reasonable and she could certainly pay every nickel, her attorneys worked hard for her. That does not obligate Bassan to contribute to her fees, particularly when she spent more of the marital estate on the fees, which are certainly a non-marital purpose to pay your divorce. For those reasons, Your Honor, as well as those stated in our opening brief in the reply, we ask that Your Honor reverse the property award in its entirety, remand for a true and proper property division trial that considers all 503 factors that the circuit court has mandated to do, and that Your Honor reverse the finding of parental allocation and the allocation of parental responsibilities consistent with the children's best interests, considering the alienation is testified to by the experts, the individuals, and everybody but for the alienated children and the alienator herself. Thank you, Your Honor. Well, thank you, counsel, all for your arguments in this matter this afternoon. We'll be taken under advisement and a written disposition shall issue. And we'd like to thank you as well for participating in a Zoom argument this afternoon. Thank you.